[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendant Robert A. Ginsburg is the owner of Unit C21, in "West Cove Marina Condominiums" (the "Condominium.") The plaintiff West Cove Marina Corporation is the unit owners' association for the Condominium. The plaintiff contends that the defendant has failed and refused to pay common charges and special assessments owing to the plaintiff and the plaintiff therefore seeks foreclosure of its lien against the defendant's unit pursuant to Conn. Gen. Stat. 47-258.
The defendant, an attorney, has filed three special defenses. The first alleges that because the plaintiff has neglected and failed to provide necessary services and repairs to the common areas of the Condominium, the defendant has been deprived of the beneficial use of his unit. The second special defense alleges that the plaintiff's lien cannot be foreclosed because the common charges were assessed in violation of the Condominium by-laws. The defendant's third claim is that his inability to pay his common charges results from the plaintiff's tortious interference with the defendant's efforts to lease the unit.
The plaintiff's first contention is that the defendant's special defenses are not recognized as special defenses to a foreclosure action. At common law, the only available defenses to a foreclosure are payment, discharge, release, satisfaction or the invalidity of the lien. Petterson v. Weinstock, 106 Conn. 436,441 (1927); Connecticut Savings Bank v. Reilly, 12 Conn. Sup. 327
(1944). Equitable considerations have also been recognized, however, and foreclosure cannot be had where the mortgagor is prevented by accident, mistake or fraud from fulfilling a condition of the mortgage. Petterson v. Weinstock, supra.
Although the defendant's second special defense arguably CT Page 2179 asserts the invalidity of the plaintiff's lien for unpaid common charges, a valid defense, the first and third defenses fail to allege any cognizable defense at common law or in equity. Accordingly, the first and third defenses are found insufficient as a matter of law. Moreover, even if such defenses were valid, the evidence offered by the defendant was insufficient to sustain his burden of proof with respect to any of the special defenses.
The Condominium is comprised of a marina and adjacent land area. A "unit" of the Condominium is a boat slip. Unit C21, owned by the defendant, is a boat slip forty-five feet in length. In his first special defense, the defendant contends that the plaintiff neglected and failed to provide necessary services and repairs to the common areas of the Condominium. The defendant testified at trial to two ways in which the plaintiff allegedly failed to service or maintain the marina. The first is the plaintiff's failure to dredge the marina area in order to maintain the depth of the boat slips. The defendant testified that he could not dock his forty-six foot boat in Unit C21 beginning in 1989 because the water became more and more shallow as the result of silting. He then docked his thirty-one foot racing boat, stored on pontoons, in Unit C21. But by 1990, he testified, Unit C21 was too shallow even for the smaller speedboat. The defendant did not personally use Unit C21 during 1991 and 1992. He permitted friends of his with a smaller boat to use the boat slip during both those years.
The defendant's testimony was effectively rebutted by the testimony of Edward Hyland. Hyland testified that he is the owner of unit C19, having purchased that slip from the defendant in April, 1990. Unit C19 is a forty-five foot boat slip directly adjacent to Unit C21, the defendant's unit. Hyland measured the water level of both units and found no difference between them. He credibly testified that he had no problem with silt or with the water level of his unit during 1991 and 1992. He further testified that he permitted someone with a forty foot boat to use his slip during the spring of 1992 and there were no problems with the water level or with silt at that time.
The defendant has failed to sustain his burden of proof on his claim with respect to dredging. Furthermore, Conn. Gen. Stat. 47-257(g) appears to bar defendant's claim even if it were proven:
No unit owner may exempt himself CT Page 2180 from liability for payment of the common expenses by waiver of the use or enjoyment of any of the common elements or by abandonment of the unit against which assessments are made.
The defendant's second claim with respect to the plaintiff's alleged failure to maintain the common areas relates to the absence of a "finger", a portion of floating dock which provides access to boats docked perpendicular to the bulkhead. The defendant testified that many of the fingers at the marina became warped over time as a result of improper design or improper installation and many fingers were repaired or replaced. The defendant's finger, however, was not repaired until May of 1991. At that time friends of the defendant went to his slip in order to use it and they found that the finger had been removed. These friends were told by someone in the office that the finger would not be repaired for the summer. At the very end of May the defendant wrote to the plaintiff's attorney complaining about the absence of the finger. The defendant's friends, who used the slip for the summer, reported that the finger was replaced during the month of July.
These facts do not show that the defendant was deprived of the beneficial use of his unit because of the plaintiff's failure to repair the finger more quickly. The evidence was that the defendant had already stopped using his unit after 1990 or a variety of reasons. Furthermore, the defendant admitted that the slip could be used without the finger although it was much more difficult to do so.
The defendant failed also to establish the claims made pursuant to his third special defense, that the plaintiff tortiously interfered with the defendant's attempts to lease out Unit C21. The defendant testified that several people were interested in renting the slip, but that these prospective tenants lost interest once they went to the Condominium to view the slip. The defendant claimed that the prospective tenants were given a cold reception at the Condominium, but he offered no facts to substantiate the claim. The only specific incident, the delay in replacing the finger, inconvenienced the defendant's friends, who were using the slip without payment. These friends were not prospective tenants. The defendant ailed to sustain his burden of proof with respect to the third special defense. CT Page 2181
In his second special defense the defendant claimed that the common charges were assessed in violation of the Condominium by-laws and that the plaintiff's lien is therefore invalid. The defendant testified that the 1990 special assessment and the 1991 and 1992 common charges were illegally assessed because of irregularities in the election of directors, the casting and counting of votes and the giving of notices for meetings.
During 1990, differences arose among the unit owners. In 1988, a block of boat slips, approximately half of the total number of slips, was sold to a corporation named Waterslip Management Corp. The president of Waterslip Management Corp. ("Waterslip") was Bruce Kerzner, who testified for the defendant at trial. Sometime prior to July 1990, Waterslip sued the plaintiff corporation and its president, Rogers L. Conant, personally. Waterslip claimed in the suit that the plaintiff had made misrepresentations to Waterslip in connection with Waterslip's purchase of the slips.
A unit owners' meeting was called for June 20, 1990 but was re-scheduled for July 25, 1990. The defendant complains that there was not proper notice of the June 20 meeting to Kenneth Ginsburg, a director, and to Mr. Kerzner, also a director. This claim is unavailing, however, because minutes of the meeting on July 25, 1990 show that Kenneth Ginsburg was present and spoke at the meeting. Mr. Kerzner was also present as were attorneys for the plaintiff and for Waterslip. Furthermore, the meeting at issue was a unit owners' meeting. The defendant fails to explain how any irregularity in notice to directors affects the validity of a unit owners' meeting. It was at this meeting that the 1990 special assessment of $1,187.10 was approved on a roll-call vote. The defendant has failed to pay this assessment.
The next unit owners' meeting was held on October 10, 1990. Mr. Kerzner, a director, attended on behalf of Waterslip and he held a proxy from the defendant as well as three other unit owners. Two new directors were to be elected. The defendant contends that Waterslip was prevented from casting its votes for the new directors and that this invalidated the election. In his post-trial memorandum, the defendant asks the court to find that Waterslip had been allowed to cast its votes for directors at all prior meetings, but was suddenly precluded from doing so.
This factual contention, like many others in the defendant's CT Page 2182 post-trial memorandum, was not supported by any evidence at trial. It is true that Waterslip was not permitted to cast its votes for directors at the October 10, 1990 meeting. Waterslip was prohibited from voting because the provisions of the agreement pursuant to which Waterslip purchased its slips precluded Waterslip from voting for the election of directors. There was no impropriety proven by the defendant in connection with the October 10, 1990 meeting of unit owners.
On February 28, 1991, another unit owners' meeting was held in order to adopt an annual budget for the Condominium. The defendant contends that the meeting was called by an "illegally elected" board of directors. This claim has already been found without merit by the court. The defendant also contends that there was no roll call vote, just a show of hands instead, and that all votes favoring the budget proposed by the board of directors were counted, but the Waterslip votes were not counted. The defendant further claims that an alternative budget prepared by Bernie Diana was not permitted to be considered despite the fact that common charges under the alternative budget would he substantially lower than those proposed under the directors' budget.
These claims were refuted by the credible testimony of Rogers Conant and also by the minutes kept of the February 28, 1991 meeting, which show that Mr. Diana distributed his proposed budget to those who were present and that he discussed his proposal. There was no vote on Mr. Diana's proposed budget because there was no second in support of his proposal. A motion was made and seconded to approve the directors' proposed budget. The result of the vote by hands was 47 votes in favor and "45 votes in opposition by Bruce Kerzner" and one abstention. (The declaration and by-laws of the Condominium do not require any specific method for how a vote is to be taken.) This contemporaneous record of the vote clearly refutes Mr. Kerzner's testimony that he was not permitted to vote and that the vote was announced as unanimous in favor of the directors' proposed budget. The defendant failed to sustain his burden of proof with respect to the second special defense. (Although the defendant claimed in his post-trial memorandum that there were irregularities with respect to the November 6, 1991 unit owners' meeting also, the court does not find that any evidence was offered with respect to a November, 1991 meeting.)
The plaintiff is entitled to judgment of foreclosure of its CT Page 2183 lien for common charges and other assessments. In order to enter such a judgment, the court must first find the amount of the debt owed. In its post-trial brief the plaintiff asserts a debt owed of $9302.48, calculated as follows:
1. 1990 special assessment $1,187.10 2. 1990 electric charge 142.83 3. 1991 common charge 2,324.25 4. 1991 electric charge 158.55 5. 1991 summer storage fee 1,435.50 6. 1992 common charge 2,324.25 7. Late charges from 6/90 to 12/92 ($50.00/month) 1,550.00 8. 1992 electric charge (estimated) 180.00 --------- Total: $9,302.48
This figure includes an estimated $180. in electric charges for 1992 which were not billed as of the date of trial. However, the testimony of the treasurer of the plaintiff at trial and the plaintiff's ledger card for the defendant, which was admitted as an exhibit, both claim that the balance due from the defendant is $9072.48 exclusive of the $180. electric charge. Ever after deducting the $180. from the higher figure, however, there is still a discrepancy of $50., which is unexplained.
The court must credit the testimony at trial and the evidence of the ledger card so that the plaintiff's claim is $9072.48. No charges unbilled as of the time of trial can be added to the amount due. Conn. Gen. Stat. 47-258 provides the Condominium association with a lien for "any assessment levied . . . or fines imposed . . .".(Emphasis added.) As of the date of trial, the $180. electric charge for 1992 was not levied or imposed.
The defendant contests the 1991 summer storage fee of $1435.50. The plaintiff offered no explanation as to the meaning of this charge, which was added to the ledger and billed to the defendant on December 15, 1992, three days prior to the trial in this matter. The defendant contends that he owns one unit in the Condominium as well as winter land storage rights for that one slip. Article VI of the Condominium Declaration does provide that each unit of the Condominium includes the right to use winter land storage area as a limited common element. Other than CT Page 2184 the use of the word "winter", there is no limitation in the Declaration restricting the use of the storage space to the wintertime. The defendant claims that he had the right to use the storage area for his boat without charge under the provisions of the declaration. Article IX(b) of the Declaration provides that there would be "no separate liability for common expenses allocated to the winter land storage limited common elements." The court finds that the plaintiff has failed to sustain its burden of proof with respect to the 1991 summer storage fee, billed in December, 1992.
The defendant also contests the late charges which are included in the debt. Beginning in February 1992, the plaintiff charged the defendant $50. as a monthly late charge on the unpaid assessments. On December 15, 1992, when the plaintiff billed the defendant for the 1991 summer storage, the plaintiff also billed for $1,000. in late charges, from June 1990 until February, 1992 at the rate of $50. per month.
Section 2.2(k) of the Condominium By-Laws gives the Executive Board of the Condominium the authority to impose charges or interest for the late payment of assessments. Section 12 of the Rules and Regulations of the Condominium, attached to the By-Laws as Schedule G, obligates owners of Condominium units to "pay to the Association a late charge in an amount to be determined from time to time by the Board of Directors. . . ." There was no evidence at trial as to whether the Executive Board of the Condominium voted to establish a late charge and if so, the amount of such charge and the effective date of such charge. The plaintiff has failed to sustain its burden of proof with respect to the late charges.
The court finds the debt due from the defendant to be $6086.98. In addition, the court awards the plaintiff costs of $1280.10, which includes the appraiser's fee of $700. The plaintiff also seeks an award of its attorneys' fees pursuant to Conn. Gen. Stat. 47-258(g) and Section 19.3(f) of the Condominium Declaration. Plaintiff's counsel submitted an affidavit showing the calculation of its attorneys' fees on an hourly basis to total $8,982.50. The court finds that the plaintiff was the prevailing party on substantially all issues and the plaintiff prevailed on the defendant's special defenses. The court awards $7500. as a reasonable attorneys' fee for the plaintiff. CT Page 2185
The last issue to be decided is the law dates. The plaintiff's appraiser testified that the current fair market value of the defendant's unit, slip C21, is $38,250. The defendant disputed the appraisal, claiming that the appraisal did not take into consideration the value of the land storage rights appurtenant to the slip. This claim is without merit. On the very first page of the cover letter which is part of the report, the appraiser notes that the property includes "certain on land storage for winter boat storage according to the Condominium declaration and offering statement. . . ." The court finds the value of Unit C21 of the Condominium is $38,250.
The plaintiff contends that Unit C21 is subject to approximately $2500. in unpaid real estate taxes, an attachment for $50,000, in favor of West Cove Associates Limited Partnership and an attachment for $2,400,000. in favor of Great Country Bank. (The second attachment encumbers other properties as well.) Both attaching creditors were named defendants in this action and have been defaulted.
The defendant contends that the title to Unit C21 is free and clear of any encumbrances except municipal taxes and encumbrances which underlie the entire marina. He claims that the West Cove Associates attachment is one which underlies the Condominium and is prior in right to the plaintiff's lien for common charges and assessments. He also contends that the Great Country Bank attachment has been released.
This dispute about law days arose after trial. Plaintiff filed a post-trial Motion for Judgment setting forth its claim with respect to the priorities by for law dates and defendant filed a written objection to the motion. This disagreement cannot be resolved on the papers, but requires an evidentiary hearing. Simultaneous with this decision, the parties are being notified of the date and time when the court will hold a hearing on the law days.
Except or the establishment of law days, partial judgment is entered in favor of the plaintiff in accordance with this decision.
Christine S. Vertefeuille, Judge CT Page 2186